[No. 3708.    Decided May 25, 1901.]

M. E. TRAVER, *Respondent*, v. SPOKANE STREET RAILWAY COMPANY, *Appellant*.

STREET RAILROADS — COLLISION WITH VEHICLE — RIGHT TO USE OF STREETS — DUTY TO LOOK AND LISTEN.

Failure to look and listen before crossing the track of an electric railway in a public street, where the cars have not exclusive right of way, is not negligence as a matter of law; but the duties of both motorman and driver of a vehicle in the exercise of care to avoid collision are mutual, with the qualification that cars cannot turn from their course, nor can they stop with the same promptness or facilities as ordinary vehicles.

SAME — ACTION FOR NEGLIGENCE — NON-SUIT.

Before a court will be justified in taking from the jury the question of contributory negligence, the acts done must be so

palpably negligent that there can be no two opinions concerning them.

SAME — PLEADING — GENERAL AND SPECIFIC ALLEGATIONS — PROOF.

Where there is a general allegation of negligence followed by an averment and enumeration of specific acts, proof will not be confined to the acts so specified, unless the complaint clearly indicates that it was the intention of the pleader to limit the charge of negligence to such specific acts.

SAME — INSTRUCTIONS — HARMLESS ERROR — GROSS AND WILFUL NEGLIGENCE.

An instruction that if defendant's employee wilfully allowed an electric car in his charge to run unimpeded up to the time when a collision was inevitable, then the verdict should be for plaintiff, is not prejudicial error, although there was no allegation or proof of wilful injury, when the complaint was broad enough to admit proof of gross negligence and there was evidence from which it might be inferred, and it appears that the instruction as given was evidently intended to cover gross negligence and that the jury were not misled by the use of the term "wilful."

SAME — CONTRIBUTORY NEGLIGENCE — QUESTION FOR JURY.

In an action to recover for injuries caused by the collision of a street car with a buggy, which was driven upon the track in an effort to get round a loaded truck, an instruction that the driver of the buggy was not bound to pass around the truck or wagon in front of him on the left rather than the right (which would carry him over the street car track), provided a man of ordinary prudence, under the circumstances as appeared to the plaintff at the time, might have pursued the course he did, is not faulty as being either a comment on the evidence, or as telling the jury that the plaintiff could choose either the safe or unsafe way in passing the truck, since it was a question for the jury to determine, under the mutual rights of plaintiff and defendant to the use of the street, whether plaintiff was chargeable with negligence in driving upon the track at the time he did.

SAME — JUDICIAL COMMENT ON EVIDENCE.

A charge to the jury that plaintiff was not guilty of contributory negligence in failing to drive directly across the track, instead of undertaking to turn and drive along the track, provided an ordinarily careful and prudent person, under the excitement and particular circumstances surrounding the plaintiff at the time, might have adopted the course pursued by him is

not objectionable on the ground of being a comment on the evidence.

INSTRUCTIONS — CONSTRUCTION AS A WHOLE — MISLEADING IN PART.

An instruction which might be deemed misleading, if taken alone, will not be held prejudicial where it appears that, when construed in connection with the other instructions given, it could not have misled the jury.

SAME — RELEVANCY OF EVIDENCE.

A requested instruction that if the jury find "that the plaintiff was not thrown out of his buggy by the collision with the car, but was dragged out by holding onto the lines, when if he had not so held on to them he would not have been dragged out, then your verdict must be for the defendant," was properly refused, where the evidence tended to show that the wheel of the buggy caught in the fender of the car; that the car and the horse were pulling the buggy in different directions; that the cross tree broke; and that this was the reason plaintiff was pulled out of his buggy.

SAME — VOLUNTARILY INCURRING DANGER TO SAVE PROPERTY.

An instruction that plaintiff had no right to attempt to save property, if such attempt would endanger him or his person, and it was his duty to use ordinary care in preserving himself, notwithstanding property might be injured if he abandoned it, was properly refused where the evidence showed that plaintiff was injured, while driving a buggy, as the result of a collision with a street car, which was running at a high rate of speed, but unnoticed by him until he had driven on the track, and, instead of jumping out, he endeavored to save both himself and property by turning the horse and buggy off the track.

EVIDENCE — EXPERT TESTIMONY — MOTORMEN.

Upon an issue as to the rate of speed at which an electric car was running at the time of its collision with a buggy, witnesses are competent as experts to testify as to the distances in which a car, going at various rates of speed, could be stopped, when it appears from their examination that they had previously handled electric motor cars, were familiar with their operation, and had either observed the kind of motor in use on the car in question, or had received instructions as to its operation; it being for the jury to determine the weight to be given to such evidence.

Appeal from Superior Court, Spokane County.—Hon. LEANDER H. PRATHER, Judge. Affirmed.

*Stephens & Bunn*, for appellant.

*F. T. Post* and *T. B. Higgins*, for respondent.

The opinion of the court was delivered by

WHITE, J.—The appellant, at the time of the injury complained of, operated in the city of Spokane a street railway by electricity. The respondent alleged in part in his complaint, that on the 16th day of March, 1899, the appellant was running a car in a westerly direction on Front avenue, and respondent was, at the same time, traveling in his buggy in an easterly direction on said avenue, and, at a point about one hundred feet west of the intersection of Bernard street with Front avenue, respondent was in the act of crossing appellant's track, when appellant so negligently and unskillfully conducted itself in the management of said car that, through the negligence of appellant and its servants in running and managing said car, the same was then and there run by appellant and its servants with great force upon and against respondent's buggy in which he was riding, and in consequence thereof the buggy was overturned and respondent was thrown to the ground, whereby he was injured; that, at the time appellant's car collided with respondent's buggy, the car was being run by appellant at a higher rate of speed than eight miles an hour, and that no bell was rung or other warning of the approach of the car given by appellant; that, by ordinance of the city of Spokane, within the fire limits (where the accident occurred), it was provided that no motorman, conductor, or other person should move any car on a street railroad track at a higher rate of speed than eight miles per hour, or at a greater rate of speed than twelve miles per hour outside said fire limits. The answer to the complaint was a general denial and the plea of contributory negligence. The respondent testified substantially as follows:

That he first became a resident of Spokane Falls (now Spokane) in 1881, and had lived in that city for the last two years before the accident; that on the 16th of March, 1899, he was driving eastward on Front avenue, between Washington and Bernard streets, on the north side of the avenue and left hand side of the railway track, and that he had traveled the better part of a block behind a loaded dray or truck, close up to the truck; that, the movement of the truck being slower than he liked, he concluded he would pass it, so he turned to the right of the truck, which act necessarily brought the wheel of his buggy astride of the left track of the street car; that he got his horse about straightened to the right of the truck,—when he was to the right of the hind wheel of the truck,—when he saw in the distance a street car coming *at an unusual rate of speed;* that this impressed him and, on the spur of the moment, he checked his horse at once; that, as he was more to the left side of the track than the right, he naturally turned back the way he came; that he was watching the car to see if it checked its speed; that he could not observe anything of that kind at all until it got very near to him; that he was alarmed at the rate of speed at which the car was coming, and did the best he could to get his horse off, but before he entirely got clear of the track the car fender struck the hind wheel of his buggy in a slanting way, so that it lifted it, then it appeared to let go, and then it seemed to move on, and tilted up the buggy, and he was spilled out and fell upon his shoulder. He was in an open buggy, driving a single horse. He could not say how fast the car was running, but it seemed to him that it was running faster than he had ever seen a street car run; that when he first saw the car it was about one hundred and fifty feet from him. "Question: Did you see the car as soon as you drove from behind the truck?

Answer: Well, I was guiding my horse, and perhaps my horse got straightened before I saw it." The truck was not in the way in pulling the horse back. When he saw the car he kept himself busy trying to get off the track, and he thought he did his best to get off the track. *He did not look or listen for a car before driving on the track.* When he got on the track he saw the car and realized his dangerous position. He first saw the car when the front wheel of his buggy was on the track, and the horse's head was then to the right of the hind wheel of the truck; that he considered that he could get off quicker by turning back, in place of driving across the track; that he checked his horse suddenly, and was scared when he saw the car coming; that it was nearer back than across. He did not jump out of the buggy because he wanted to save everything. He had hold of the lines. The cross piece to which the singletree of the buggy was attached broke at the time the fender lifted up the wheel of the buggy. He held on to the lines as the horse was going obliquely away from the track. "Question: Now, is it not a fact that those lines— holding on to them,—is what pulled you out of that buggy? Answer: Not at all; it was safer to hold on to them than to let go." The truck was a loaded truck. The load on the top of the truck was so high that it obscured the view in front. It was up grade from Bernard street to Division street, but where the accident happened it was level. The car was about the center of Bernard street when respondent saw it. He presumed there was sufficient space within the curb of the street and the truck to have passed the truck on the left, but that the main width of the street was to the right of the truck, and, presuming the street to be clear, he thought it better to take it; that he was not attempting to cross to the south side of the street; he was attempting to drive around the truck, but there was

not room for him to pass the truck without going on the track. He had followed right behind the truck, probably a block. He did not hear any bell of the car ring. He was not absent-minded when driving, but looked ahead. His fear was caused because the car was going at more than ordinary speed; that, if the car had been going at an ordinary speed, he could have gone across or back safely. "Question: You did not know what was the ordinary or what was the excessive rate of speed at that time, then? Answer: Oh, just catching it with my eye. I knew what was usual and what was unusual." The motorman commenced stopping the car when he got pretty near. The car did not stop with the wheel on the fender, but went a little by. The car shoved the buggy out so that it was clear of the car when the car stopped. The buggy was a few inches over five feet wide; the truck was about seven feet wide. From the north rail of the track to the curb on the north side of the street was about twenty-five feet. While he was behind the truck he could look up but could not be sure as to what was in front. His shoulder was dislocated by the accident. There was testimony for respondent, from passengers on the car, tending to show that the car was running at the rate of thirteen or fourteen miles per hour until it reached the Bernard street crossing, except when it slowed up for switches or to pick up passengers, and that at the Bernard street crossing it slowed up to about half that rate, at which last rate the car was moving when the buggy was struck; that the car ran seven or eight feet after it struck the buggy; that the car was a double-trucked, heavy car, twenty-five or thirty feet long. One witness says the car was running "unusually fast" just before the accident occurred. "Question: How came you to be noticing the speed of the car? Answer: We were going so fast. Q. Now, it had slowed down at Di-

vision street, and then started up very rapidly after it crossed,—is that it?  A.  Yes.  Q.  Going faster than the usual and ordinary rate of speed?  A.  Yes; it seemed so. Q.  What was it, if anything, attracted your attention and made you think the car was going unusually fast?  Was there something you can tell us?  A.  No; I don't know of anything, except that it was going very rapidly,—unusually fast.  Q.  What called your attention to the accident, if anything?  A.  The car jarring; jarring of the car; seemed to jar as it struck.  Q.  Just describe what you saw and felt.  A.  The motorman was turning the handle so rapidly seemed to jar the whole car; you could feel it jar."  Another passenger witness says no bell was rung; that the speed was pretty fair, but not very fast; that it was down hill; that he was about one hundred and fifty feet away when he saw the buggy; that the car ran at the same speed until between forty and fifty feet of the buggy. No attempt was made before that to stop the car or slacken its speed.  When forty or fifty feet from the buggy, power was thrown off and brake put on at the same time. A quick stop after the motorman started to stop.  He did not attempt to do anything with any cranks, the current, or the brake until he did the whole thing and stopped it immediately.  The truck was pretty close to the car track, —about five feet from it.  One witness, not a passenger, says the car came up to where the accident occurred "pretty fast."  Another witness, who had experience in operating street cars, not a passenger, who observed the car at Brown street, which is west of Division street, from seven to eight hundred feet east of where the accident occurred, says that at about that point the car was running from fifteen to sixteen miles an hour.  There was also testimony on the respondent's part tending to show that, in case of an emergency, the car could be stopped with the brake, if running

at the rate of ten miles per hour, in from forty to fifty feet; that if running at fifteen miles per hour it could be stopped in an emergency, by using the reverse current and the brake, in from twenty to twenty-five feet. There was testimony that if going eight miles an hour it could be stopped, in an emergency, in from thirty to forty feet.

For the appellant the motorman in charge at the time of the accident testified, in substance, that the accident occurred one hundred and twelve or fifteen feet west of Bernard street; the rate of speed was four or five miles an hour; that he saw the team in front of respondent's buggy; that it was a wood wagon with rack; that he did not know whether it was loaded; that it was the first team ahead that he saw; that he rang his gong for it; that respondent was not over thirty or forty feet from the car when he first turned on the track; that the wood wagon team was just opposite the front of the car when he turned on the track; that witness turned on the emergency brake and used everything that he knew of to stop the car; that when he first saw the two teams together they were from seventy-five to one hundred feet from him, the buggy following the wood wagon and close behind it; that the buggy was just crossing the fender when the car came to a standstill; the hind wheel of the buggy caught in the fender; the front wheel ran across the fender; after the hind wheel caught, the horse kept on going; the cross piece, that the singletree was attached to, broke; the respondent was dragged out by the lines; that if he had been dragged straight out over the dashboard he would have probably hit the car; that he did not go straight over the dashboard but fell over the outside corner of the dashboard and wheel of his buggy. A Mr. Hall, who was standing in the doorway of a barn on the north side of Front avenue, thirty or forty feet west of where the accident occurred, testified: "As I was stand-

ing in the doorway, I was looking out of the door and seen a wagon, . . . not right opposite the door, but quartering toward it from the door; and this Mr. Traver, he was behind the rig in a buggy, but I don't remember how far he was behind that rig, . . . or whether he was on the north of the street-car track, or whether he was astraddle of the rail,—that is, the buggy was astraddle of the rail; and just as the car—*then I noticed that the car was at the crossing on Bernard street,* and it seemed like Mr. Traver started to go across the track ahead of the car, and he could not make it in that way, so he turned the horse right around,—turned the horse to the side of the car,—and the wheel—the hind wheel—then slid up next to the car, and there is where the collision took place." He says Mr. Traver fell out of the buggy about the time the fender caught the wheel, that the horse was pulling away from the car, and the car was pulling, and the horse broke loose. This witness, on cross-examination, seems to say that it was from twenty-five to thirty *paces* from where the respondent went on the track to where the car was. He testifies that there was room on the street for the buggy to have passed to the left of the wagon. "Question: The second time Mr. Traver was there to see you, didn't you tell him it was one hundred and twenty-five feet—one hundred and twenty-five feet from where the car was when you first observed it to the point where he went on the track? Answer: Well, of course, we stepped it, but for me saying just how far— Q. You can't remember that? A. Never paid enough attention to it. I was busy all the time." A Mr. Kenwood, who was standing near Mr. Hall, says that when he first saw the respondent he was trying to get out of the way of the car, and that his horse's head was pointed east, and that when he first saw him the car was fifty feet or a little more from him. Mr. Walton says he

was sitting in front on the car; heard the gong ring; knew there was something up; looked out in front; saw a team coming against the car; it turned out; just as it turned out, respondent appeared from behind it with a one horse rig. The time was so short the car and respondent had a collision. He aimed to turn out, but did not get out in time, and the car struck the wheel of the buggy. It ran up on the fender and threw Mr. Traver out. The motorman stopped the car pretty suddenly,—about as quick as he ever saw a car stop. His attention was first attracted by the ringing of the gong. It was not long after the gong rang they got together, one going one way and the other meeting. "Question: Did you see Mr. Traver at the time the bell was rung or gong rung? Answer: No, sir. Q. You didn't see what the trouble was? A. There was a team in front of him that they were ringing for, as I supposed. I didn't see Mr. Traver until that team turned out." He thought a part of the wagon the gong rang for was on the track. Mr. Bradley, another passenger on the car, says respondent pulled out from behind a large rig he appeared to be following. "He pulled on the track, and it was then he appeared to come in within range or sight of the car, and he then endeavored, as I could see at that time, to try to clear the track." The motorman was doing his best to stop the car. Did not observe the motorman until the collision was imminent. Mr. Lee, a passenger on the car, testifies: "We were coming along about Bernard street. There was a heavy wagon and the respondent right behind. The heavy wagon was close to the track. When we got close to it respondent started out to cross the track with his buggy, and the motorman started to turn the brake and stop the car. The respondent started to turn around and come back to the same side of the track. The motorman rang the bell. Immediately on appearance of respondent

the motorman started to stop the car. The motorman was ringing the bell trying to make the wagon pull out before respondent drove on the track, and the car was not over ten yards from the wagon when the bell began to ring." Another passenger witness says that the first thing she saw was a large truck or dray wagon, and just before the car got up to that there was a team right behind it, and it turned out on the car track, and before the motorman could stop he struck the team; that the car was not going rapidly; that the gong was rung; that in stopping the car the passengers were jolted pretty badly. Mr. Notbohm, the superintendent of the road, testified that the fenders of the car extended over the rail about twelve or thirteen inches; the car was thirty-one feet long, exclusive of fenders, and weighed twenty-two thousand pounds. In rebuttal, respondent testified that the first time he talked to Mr. Hall, a witness for appellant, Mr. Hall said he could designate just the points where the respondent drove on the track and where the car was at that moment, and he did so, and that the witness paced it, and called Hall's attention to it, and it was, as near as he could make it, one hundred and forty feet; that he saw Hall a second time, and Hall indicated the points where witness went on the track, and where the car was at that time, and that the second pacing made it one hundred and forty-five feet; that he saw Hall a third time, with his attorney, and that time the distance was brought down to one hundred feet; that Hall told him that he saw the car and his entrance on the track simultaneously; that the car was then near the center of Bernard street.

We have abstracted the testimony at great length, because the appellant asked the court to instruct the jury that their verdict must be for the defendant. The principal contention of the appellant is that the doctrine to

"look and listen, and stop if necessary," is applicable to electric street railways, and that the case, on the evidence, should have been taken from the jury, and decided by the court in favor of the appellant as a matter of law. This court, in a recent case against this appellant, held:

"It is not negligence *per se* if it is not shown that one looked and listened in crossing a street railway. The degree of care required in crossing a highway and steam railway, in looking up and down the track, is not necessarily the test of care required in crossing the track of a street railway on a public street. Failure to look and listen before crossing the tracks of an electric railway in a public street, where the cars have not exclusive right of way, is not negligence as a matter of law." *Roberts v. Spokane Ry. Co.,* 23 Wash. 325 (63 Pac. 506).

The car track is as much the street as any other portion of the traveled way. Of course, one must use his senses when driving on the streets, and in so doing he must do that which reasonable and ordinary care requires, and ordinarily it is a question for the jury to determine whether he has so acted. If respondent had looked in the particular instance under investigation, we are not prepared to say it would have been negligence to have driven on or across the track, if the car was as far away as he says it was when he first saw it, for he had a right to presume that those in charge of the car would observe his movements, and would not run him down. The obligations of the operator of the car and his obligations were mutual. Each was obligated to look out for the other, and govern his movements accordingly, just the same as if the vehicles they were driving were ordinary hacks or teams, with this qualification: That cars cannot turn from their course; they run on fixed tracks, and cannot accommodate themselves as readily to emergencies and cannot stop with the same promptness or facility, as drivers of free vehicles, and

drivers of such vehicles must yield the right of way with reasonable promptness to the passing cars.   The supreme court of Minnesota has well stated the proposition thus:

"The evidence shows that if, after he got beyond the obstruction of the building on the corner, he had looked northward as well as southward, he could have seen the approaching car in time to have stopped his team before getting in dangerous proximity to the car track, and his failure to do so is claimed to be negligence *per se,* under the rule, so often applied by this and other courts, that it is the duty of a traveler on approaching a railroad crossing to look both ways for approaching trains before attempting to cross the railroad track.   The fallacy in this, which runs all through counsel's argument, is in assuming that the degree of care required at the crossing of a highway and an ordinary steam railroad is the test of the care required in crossing the track of a street railroad on a public street.   The two cases are not alike.   In the first place, street cars do not, or at least ought not to, run at the same rate of speed, are not attended with the same danger, and are not so difficult to stop quickly, as those of an ordinary railroad.   In the next place, the cars of a street railway have not the same right to the use of the track over which they travel.   The ordinary railroad is itself a highway, and has a proprietary interest in and to its right of way, even where the public have an easement for highway purposes over the same ground.   Public necessity requires that the rights of a traveler on a highway across an ordinary railroad should be, to a certain extent subordinate to those of the railroad company. But a street railway is not a highway. A street railway company has a mere right to use the street in common with the public generally.   It is merely in aid of the identical use for which the street was created, and not a new and independent one, and it is on that very ground that a street railway company is not required to pay compensation to the owners of abutting property.   Street cars are in the main governed by the same rules as other vehicles on the street, and their owners have only an equal right with the traveling public to use the

street,—they have no proprietary right to any part of the street. Of course, there are some modifications of this general rule growing out of the necessities of the situation. For example, as street cars run on a track, they cannot turn out to one side of it. Hence what is called 'the law of the road' does not apply to them. It would be inexpedient to attempt any complete enumeration of the modifications of or exceptions to the general rule of equality of rights between street cars and other vehicles used on a street. But it is certain that there is no modification or exception that relieves a street railway company from exercising, at least, as much care to avoid collisions with other vehicles as the owners of the latter are required to exercise in order to avoid collisions with the cars." *Shea v. St. Paul City Ry. Co.,* 50 Minn. 395 (52 N. W. 902); *Robbins v. Springfield St. Ry. Co.,* 165 Mass. 30 (42 N. E. 334).

The supreme court of Massachusetts says:

"The fact that the power used by the street railway company is electricity, instead of that of horses, has not been deemed by the court sufficient to make the rule of law which has been laid down concerning the crossing of the track of a steam railroad exactly applicable to a street railway." *Robbins v. Springfield St. Ry. Co., supra.*

The great weight of authority is to the effect that, before a court will be justified in taking from the jury the question of contributory negligence, the acts done must be so palpably negligent that there can be no two opinions concerning them. *Steele v. Northern Pacific Ry. Co.,* 21 Wash. 287 (57 Pac. 820); *McQuillan v. Seattle,* 10 Wash. 464 (38 Pac. 1119, 45 Am. St. Rep. 799).

Under the facts in evidence in this case, we do not think the court erred in refusing to give the peremptory instruction "to find for the defendant," requested by the appellant.

The principal charge of the court was as follows:

"1.  Negligence has been aptly defined to be the omis-

sion to do something which a reasonable man, guided by those considerations which ordinarily regulate and conduct —regulate the conduct of human affairs, would do, or the doing of something which a prudent and reasonable man would not do, under the circumstances of a given case. Before you can find for the plaintiff, therefore, you must find the defendant to have been guilty of negligence as alleged in the complaint. Another principle of law proper to be mentioned in this connection is that, if the plaintiff was himself guilty of negligence which materially contributed to the injury complained of, he cannot recover.

"2. This last proposition, however, has its exceptions; and I instruct you in this connection that, if you believe plaintiff was negligent in going upon the defendant's track at the time and place and manner indicated by the evidence, still, if you find that the accident might have been prevented by the use of ordinary care upon the part of defendant's employees in charge of the car, after they discovered the plaintiff upon the track; and if you find that they did not exercise such care, but, knowing the plaintiff's danger, if he was in danger, *wilfully* allowed said car to run unimpeded up to the time when a collision was inevitable, then your verdict should be for the plaintiff.

"3. It is conceded that Front street, where the accident occurred, is a public highway. That being true, the plaintiff had as much right to be upon and travel over the same and every portion thereof, as the street car company; their rights were equal and mutual in that respect, with this qualification, however, that when both desired to pass a given point at the same time it is the traveler's duty to yield the right of way to the street car, as, in the very nature of the case, it is unable to pass over other portions of the highway,—as, in the nature of the case, he is able to pass over other portions of the highway and the street car is not. With this exception and qualification, their rights are equal; and in this connection it is proper to say that plaintiff was not bound to pass around the truck or wagon in front of him on the left rather than the right, over the street car track, provided a man of ordinary prudence, under the circumstances, as appeared to the plaintiff

at the time, might have pursued the course he did. It is to be remembered, also, that they were both under obligations to exercise those rights with reasonable care, so as to prevent accidents to themselves and the public generally.

"4. What is reasonable care in a given case is to be determined by the circumstances and facts of that particular case. Negligence, or, which is the same thing, the absence of reasonable care, as already stated, is the foundation of this action, and it is to be determined by what the jury find an ordinarily prudent and careful man would have done under the particular circumstances of this case. If, tried by this rule, you find the defendant was not guilty of the negligence which produced the injury complained of, your verdict should be for the defendant. On the other hand, if, tried by this rule, you find the defendant was negligent in the management of the car in question, and that such negligence produced the injury complained of, you should find for the plaintiff, unless you find that he was guilty of contributory negligence, as heretofore defined.

"5. If you find that the car which struck the plaintiff's buggy at the time of or just previous to the collision was being run at a greater rate of speed than eight miles an hour, which is the limit under the ordinance of the city of Spokane, you would be justified in finding the defendant guilty of negligence in running the car at such rate of speed; and, if you further find that such negligence caused the injury complained of, you should find for the plaintiff, unless he was guilty of contributory negligence.

"6. If you should believe that the plaintiff might have avoided the accident by driving directly across the track instead of undertaking to turn, he would not necessarily be guilty of contributory negligence in that respect, provided you find that an ordinarily careful and prudent man, under the excitement and particular circumstances surrounding the plaintiff at the time, might have adopted the course pursued by him. His conduct in that regard is not necessarily to be judged by the facts as they now appear before the jury, as the same are subjected to the cool, calm consideration that you will be able to give them in the light

16—25 WASH.

of all the facts and circumstances as they are now made to appear, but he is entitled to have them considered as they appeared to him at the time; and, as I said, if an ordinarily careful and prudent man might have acted as the plaintiff acted, with his view of the circumstances, as they then appeared to him, you will be justified in finding that he was not guilty of contributory negligence by turning back rather than by going directly across the track.

"7. The defendant is only required to use ordinary care in the operation of its cars, and the plaintiff is required to use the same degree of care,—that is, ordinary care,—in the use of the streets, and in crossing or going upon the track of the defendant. By ordinary care is meant such care as an ordinarily prudent person would use, under the particular circumstances involved.

"8. If the collision between the plaintiff and the car of the defendant was unavoidable, then your verdict must be for the defendant.

"9. You are instructed that, if you shall find that the defendant was operating its car at a high rate of speed, yet if you shall further find that the plaintiff, Traver, by his negligence and want of ordinary care, contributed to the accident in any appreciable degree, your finding must be for the defendant.

"10. You are instructed that if you find from the evidence, that the car was running at a moderate or ordinary rate of speed, and that the bell or gong had been sounded, and that the plaintiff suddenly and without warning, and under circumstances which were not reasonably to be expected, drove upon or attempted to cross the track of the defendant in close proximity to the car of the defendant, and at a time when it was not prudent to do so, then and in that event the plaintiff would not be exercising ordinary care or prudence.

"11. You are instructed that if the plaintiff failed to look and listen, and stop, if necessary, or take any reasonable precaution whatever to ascertain whether a car was coming upon the track of the defendant, then and in that event it was negligence upon the part of the plaintiff to drive upon or attempt to cross the track of the defendant,

if the car of the defendant was in close and dangerous distance of the plaintiff.

"12.   You are instructed that if plaintiff, Traver, was guilty of any act of negligence which directly contributed to his injury, or was guilty of any lack of ordinary care on his part, whether the act be an active one or an omission to do what he ought to have done, under the circumstances, and such lack of care, act, or omission contributed to the accident, and without which the accident would not have occurred, then you cannot go further and apportion the accident or injury, but the plaintiff's contributory negligence in such case defeats recovery, and your verdict must be for the defendant.  I charge that, and in such case, your verdict must be for the defendant.

"13.   You are further instructed that, notwithstanding you should find that the defendant was guilty of negligence in the operation of its car, yet, if you further find, that the accident or the injury to the plaintiff would not have happened except for the negligence or failure to use ordinary care upon the part of the plaintiff, then your verdict must be for the defendant.

"14.   You are further instructed that the defendant company, at the place where the accident happened and the collision occurred, had the preference and superior right to the use of the track, and that it was the duty of the plaintiff not to obstruct the use of said track or the operation of the cars thereon, and it was his duty to turn out to allow such street car to pass, if he was driving upon the track, and it was his duty to remain off the track and not attempt to cross the same in front of a moving car, except at a safe distance therefrom, and a failure in either of these respects constitutes contributory negligence and defeats recovery, and entitles defendant to a verdict.

"15.   You are further instructed, that it was the duty of the plaintiff, Traver, to use his senses—his eyes and ears,—to discover the proximity and passage of the car of the defendant, and his failure to do so would constitute contributory negligence, and prevent any recovery by him.

"16.   Ordinary prudence and common sense suggests to every one who is aware of the character and operation of

electric street cars that it is dangerous to pass in front of them at a short distance while in motion, and one who does so without looking and listening, when, if he had looked and listened, he could have discovered the car, is guilty of contributory negligence and cannot recover; and if you find if Mr. Traver had looked and listened he could have discovered the car, and thus have avoided the accident and injury, and that he failed to do so, your verdict must be for the defendant.

"17.  If you find from the evidence that plaintiff, Traver, could, by the exercise of ordinary care, after he saw the street car, have avoided the injury to him by getting off the track before the car and his buggy collided, then, and in that event, your verdict must be for the defendant.

"18.  You are instructed that if plaintiff, Traver, was not in imminent peril at the time he drove upon the track or attempted to cross the track of the defendant, the motorman had a right to presume that he would pass on over and off of the track, out of the way, and the motorman was not guilty of negligence in failing to stop the car, in either of the events just mentioned, until the peril of the plaintiff became imminent.

"19.  You are further instructed that, if a person be seen upon the track of defendant's electric street railway who is apparently capable of taking care of himself, the motorman may assume that such person will leave the track before the car reaches him, and this presumption may be indulged in so long as the danger of injuring him does not become imminent, and it is not necessary for a motorman to slacken the speed of the car until such danger does become imminent.

"20.  You are further instructed that if the plaintiff, Traver, thought he had time to cross the track of the defendant, if he was attempting to cross the track, before the car of the defendant would reach him, and did not have sufficient time so to do, then it was an error in judgment on the part of the plaintiff, and he cannot recover, and your verdict should be for the defendant."

These instructions, taken as a whole, fairly presented to the jury the law applicable to the issues joined.  We might

rest with this statement, but specific exceptions to certain of the instructions given, as well as certain other instructions requested by appellant and refused, were taken, and it is but just to appellant that we briefly examine them. The general allegation of negligence is found in the third paragraph of the complaint, and is to the effect that, through the negligence of the defendant in "running and managing" the car, the injury was inflicted. Under this allegation, it would have been competent for the plaintiff to have shown the rate of speed at which the car was running; that such speed was greater than allowed by the city ordinance; and that, in the management of the car, the warning bell was not rung. The allegations in paragraph five are to the effect that the speed was a higher rate than eight miles an hour, and no bell was rung or other warning given by defendant of the approach of the car; and in paragraph six the speed at which, by ordinance of the city, a car was allowed to run is alleged. In some jurisdictions it is held that, when there is a general allegation of negligence followed by an enumeration and averment of specific acts, the plaintiff is confined to the acts so specified. Unless the complaint clearly indicates that it was the intention of the pleader to limit the negligence to the specific acts, we do not think that, under our liberal system of pleading, such a rule should prevail in our courts. The facts pleaded in paragraphs five and six of the complaint were merely evidentiary matter. The complaint does not allege facts upon which to charge wilful negligence, and it may be conceded that the use of the term "wilfully" in the second instruction of the court was not warranted by the allegations or proof. We are at a loss to understand, however, how the error complained of was prejudicial to the appellant. There was no evidence in the case from which a wilful injury could be inferred. The allegations of the complaint

were broad enough to admit proof of gross negligence. There was evidence from which gross negligence might be inferred. There was no instruction given on the question of gross negligence. This instruction was evidently intended to cover gross negligence. It requires stronger and more convincing proof to establish wilful negligence than gross negligence. If it appear that the jury are misled by the instruction to the injury of the party complaining, the judgment will be reversed. On the other hand, where it is apparent that the instruction could not have been prejudicial, the giving of such an instruction, though error, will not operate to reverse. This is especially true where the instruction is favorable to the party complaining. *People v. Riley,* 65 Cal. 107 (3 Pac. 413) ; *Berry v. Missouri Pacific Ry. Co.,* 124 Mo. 223 (25 S. W. 229) ; *People v. Cochran,* 61 Cal. 548.

The objection urged to instruction three, given by the court, is that it fails to instruct the jury that the rights of the street railway were *paramount and superior* to the rights of those traveling upon the streets. What we have said as to the peremptory instruction requested by appellant applies to this instruction. We think the court, in instruction three, and instruction eleven, which must be read in connection with it, correctly stated the law. Whether the respondent should have driven upon the track at the time he did, or should have passed to the right or the left of the vehicle in front of him, were questions, under the circumstances of this case, for the jury. Clearly it was not for the trial court to say that the respondent was chargeable with such negligence in the use of the street, which he had a lawful right to use, as contributed to the accident. As was said by the supreme court of New Jersey:

"Before the trial judge could so determine, the proof must have been so convincing to him that he could extract

from it no other reasonable inference or conclusion. If the facts were such as that these questions remained in substantial dispute, then they must be submitted to the jury. If, from the facts in evidence, two inferences or conclusions can be reasonably deduced, one favorable to the plaintiff and the other against him, a question then is presented which conclusively calls for the opinion of the jury. This principle is alike applicable to the question of whether negligence, as the proximate and sole cause of the injury, has been established against the defendant or not." *Consolidated Traction Co. v. Reeves,* 58 N. J. Law, 573 (34 Atl. 128); *Murphy v. Nassau Electric Ry. Co.,* 46 N. Y. Supp. 283.

The fact deducible from the testimony of the respondent is that there was no danger when the respondent turned on to the track, and that he did not go into a position of danger, because the car was at such a distance from him as to make it safe for him, without unreasonably obstructing the car track, to pass the team in front of him. We do not think the instruction was such a comment upon the evidence, if a comment at all, as to be prejudicial to appellant. The appellant cannot object to that portion which says that the plaintiff was not bound to pass around the truck in front of him on the left, rather than the right, over the street car track, provided a man of ordinary prudence, under the circumstances as they appeared to plaintiff at the time, might have pursued the course he did, because the court assumes that there was room to pass around the truck on the left, and if this was prejudicial it was to the respondent rather than to the appellant. The other criticism of this instruction by appellant is based on the assumption that the respondent got into the position he was by reason of his own negligence. We have said that this was a question, not for the court to assume, but for the jury to determine.

As to instruction six, the following is from the appellant's brief:

"It is a comment upon the evidence in calling the attention of the jury to the fact that if he did, or failed to do, a particular thing, he was not guilty of contributory negligence, although he might have done something else and avoided the accident. It was a comment upon the evidence to tell the jury that he was not guilty of contributory negligence in failing to drive directly across the track, instead of undertaking to turn and drive along the track, provided an ordinarily careful and prudent person, under the excitement and particular circumstances surrounding the plaintiff at the time, might have adopted the course pursued by him. The instruction is erroneous in telling the jury that he was not guilty of contributory negligence if an ordinarily prudent man *might* have adopted the course pursued by him. The use of the word '*might*' is clearly misleading and not warranted by the law. It is purely speculative to say what *might,* or *might not,* have been done. The rule of law requires a person to act as an ordinarily prudent person *would* have acted, not in such manner as some ordinarily prudent person *might* have acted. The instruction was not applicable to the facts of this case, and the respondent was not entitled to have the same given. A person cannot invoke the rule attempted to be announced in that instruction, when the sudden danger is occasioned in whole or part by his own fault or negligence, as in the case at bar. Shearman & Redfield on Negligence, paragraph 89, in discussing the rule of mistaken judgment under sudden alarm, closes the section with the following sentence: 'No such allowance is made in favor of one whose own fault has brought him into the peril which disturbs his judgment.' "

We do not think this is a comment upon the evidence, within the constitutional inhibition. It simply states what might be done under a certain state of facts, but leaves the jury entirely free to determine the facts. The comments on the terms "might" and "would," it seems to us, are over critical. As we have said, it was for the jury to say,

and not for the court to assume, that the danger was occasioned by the fault and negligence of the respondent. That being the case, the instruction was proper if the jury came to the conclusion that it was not the plaintiff's own fault that brought him into the peril, disturbing his judgment.

The appellant objects to that portion of instruction four which says:

"If, tried by this rule, you find the defendant was not guilty of the negligence which *produced* the injury complained of, your verdict should be for the defendant."

It is true that the question to be determined is not whether the plaintiff's negligence *produced,* but whether it *contributed to,* the injury complained of. But this instruction must be read in connection with instructions No. 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, and 20, and when so read we can safely say the jury were not misled.

Instruction five, even if erroneous, was not misleading when taken in connection with instructions thirteen and seventeen.

The eighth instruction requested by appellant was properly refused. It was to the effect that it was the duty of a person, before going upon or across the track of an electric street railway company, to look and listen, and, if necessary, to stop; that if the plaintiff failed so to do, and drove upon or attempted to cross the track of the defendant, he is presumptively guilty of negligence, and the burden of proof is then upon him to show that he was free from fault in any respect whatever. What we have said as to the refusal of the court to give the peremptory instruction requested by the appellant, and as to instruction three given by the court, applies to this assignment of error. As to looking and listening, instructions fifteen and sixteen together, as given by the court, correctly stated the law, as we view it, relative to electric street railways.

The appellant is incorrect in stating that the testimony shows that the respondent was pitched forward· over the dashboard, *and toward the car*. The motorman, on cross-examination, testified:

"Question: Did you see whether ·the plaintiff went over the dashboard or at the side of his buggy? Answer: Well, now, if he went right straight over the dashboard, of course, he would have probably hit the car, and he didn't go right straight over the dashboard, and a dashboard of a buggy is pretty narrow. Now, he probably fell, kind of went over where the outside corner of the dashboard and the wheel of his buggy— Q. On which side of his buggy? A. On the opposite side of the car."

This testimony tends to show that he was tipped out; at least, all this was a question for the jury, and the instruction requested by appellant to the effect, "If you find from the evidence that the plaintiff, M. E. Traver, was not thrown out of his buggy by the collision with the car, but was dragged out by holding onto the lines, when if he had not so held onto them he would not have been dragged out, then your verdict must be for the defendant," was properly refused by the court. Besides, there was testimony tending to show that the wheel of the buggy caught in the fender of the car; that the car was pulling one way, and the horse the other, and the cross tree broke, and that this was the reason the plaintiff was pulled out of the buggy. The question as to what was the proximate cause of the injury, and as to what would have been the result if the respondent had not held on to the lines, was for the jury alone.

The appellant requested the following instruction, which was refused:

"You are further instructed that the plaintiff, M. E. Traver, had no right to attempt to save property, if such attempt would endanger him or his person, under the cir-

cumstances detailed in evidence in this case, and it was his duty to use ordinary care in preserving himself and his person from danger or injury, notwithstanding property might be damaged or injured if he abandoned it."

The only evidence in the case upon which to base the instruction was the following, on the cross examination of the respondent:

"Question: No; you just stopped your horse, and waited until the other rig got out of your way? Answer: No; I didn't have occasion to do that; my horse he kept on moving, and I checked my horse sudden, and was scared to see the street car coming, and it was nearer back than across, and I thought that was the proper way to go. Q. You thought you could get off that way without any trouble? A. I thought I ought to. I didn't know I could the way the car was coming. Q. If the car was coming very rapidly, as you say it was, why didn't you jump out of the buggy? A. Because I wanted to save everything."

There is nothing to show that he would have been any safer in jumping out than in remaining in the buggy. The car was almost upon him and he was in the buggy on the track, and whether he could have cleared the track or cleared the car by jumping does not appear. It does appear, however, that he was an old man, and from that fact the jury might infer that he was unable to save himself by jumping from the buggy. There is testimony from which to conclude that he was in a position of danger by reason of the negligence of the appellant in running its car at a high rate of speed and failing to stop in time, and that he was greatly alarmed by the speed at which the car was running. Under such circumstances, he cannot be held for an error in judgment. If a person in a position of safety voluntarily goes into a position of danger for the purpose of saving property and is injured he cannot recover. That is not this case, however.

Did the court err in overruling defendant's objection to

the competency of the witnesses Long, Nelson, and Dragoo, who were called as experts to testify as to the distance in which a car, going at various rates of speed, could be stopped? The witness Long had previously handled electric motor cars. He had been to the car barn of the appellant company two or three times, and had observed the motors used by it. He had worked in car shops two years. He had had the whole thing explained to him and had worked on motors himself, adjusting them to cars, and had also operated electric motor cars. The witness Nelson had been a motorman in the service of the appellant company something over two years, and had worked on the road about eight months, both as motorman and conductor, and had worked on cars similar to the one in use at the time the injuries were inflicted on the respondent. He had worked for the company as late as 1897, and had even received instructions as to the operation of the motor in use at the time of the accident. The witness Dragoo worked for the company during the years 1892, 1893, and 1894, and had acted as both conductor and motorman during that time. It is clear from the examination of these three witnesses as to their competency to testify as experts, that they were men of considerable experience in this line of employment. It is safe to assume that they were the best experts obtainable by the plaintiff. It is true that motormen then in the employment of the defendant corporation were no doubt better acquainted with the equipment of this car and better qualified to testify than were the witnesses called. The respondent, however, should not be compelled to look to employees of appellant for expert witnesses. The reasons are obvious. The rule covering the admission of this class of testimony is well laid down in 12 Am. & Eng. Enc. Law (2d ed.), p. 427, where it says:

"On the whole, it can hardly be said that there is any

well defined standard by which to measure the qualifications of an expert, and it is largely in the discretion of the trial judge to determine them."

In the case of *Montana Ry. Co. v. Warren,* 137 U. S. 348 (11 Sup. Ct. 96), the supreme court of the United States, in commenting upon evidence of this character said:

"The means and extent of his information, and therefore the worth of his opinion, may be developed at length on cross examination. And it is fully open to the adverse party, if not satisfied with the values thus given, to call witnesses in the extent of whose knowledge and the weight of whose opinions it has confidence."

In the present case, after the three experts had testified, the appellant introduced no evidence whatsoever as to the distance in which cars moving at various rates of speed could be stopped. It placed its superintendent, L. F. Notbohm, upon the stand, and questioned him at length as to the methods of stopping a car, but asked him no questions as to the distance in which it could be stopped while going at various rates of speed. With the ability to place upon the stand a number of motormen thoroughly competent to testify upon this question, it failed to avail itself of that opportunity. It is fair to assume that the testimony of the experts examined on behalf of the respondent was correct, and could not be successfully controverted. A court trying a cause must determine the competency of a witness to testify as an expert, but it is for the jury to determine the weight of such evidence. *Forgey v. First Nat. Bank of Cambridge City,* 66 Ind. 123.

The best statement of the rule governing the admission of this class of evidence is the one of Mr. Justice CLIFFORD, of the supreme court of the United States, in the case of *Spring Co. v. Edgar,* 99 U. S. 658, where he says:

"Whether a witness is shown to be qualified or not as an expert is a preliminary question to be determined in the first place by the court; and the rule is, that if the court admits the testimony, then it is for the jury to decide whether any, and if any what, weight is to be given to the testimony. Cases arise where it is very much a matter of discretion with the court whether to receive or exclude the evidence; but the appellate court will not reverse in such a case, unless the ruling is manifestly erroneous. *D. & C. Steam Towboat Co. v. Starrs,* 69 Pa. St. 36; *Page v. Parker,* 40 N. H. 48; *Tucker v. Massachusetts Central Railroad,* 118 Mass. 546."

Tested by this rule, nothing short of a clear abuse of discretion will justify an appellate court in reversing the judgment of the trial court for its refusal to exclude expert testimony. Clearly, there is not only no abuse of discretion on the part of the trial judge in this case, but the witnesses were shown to be qualified to testify. The evidence was conflicting, but every rule of law pertinent to the liability of the appellant, or to the relative duties of the parties under the circumstances deducible from the evidence, was laid before the jury. The jury by its verdict has found that the respondent did not contribute to the injury; that the appellant was negligent as charged. The judgment of the court below is therefore affirmed.

REAVIS, C. J., and DUNBAR and ANDERS, JJ., concur.

FULLERTON, J., concurs in the result.