[No. 9734.  Department Two.  January 23, 1912.]

·WILLIAM MORRIS, *Respondent*, v. SEATTLE, RENTON &
SOUTHERN RAILWAY COMPANY, *Appellant*.[1]

TRIAL—NONSUIT—WEIGHT OF EVIDENCE.  In passing on a motion
for a nonsuit, where plaintiff's evidence was vague, the court is
justified in taking into consideration expert evidence that plaintiff's
mind had been affected by the accident.

STREET RAILWAYS—COLLISION WITH VEHICLE—CONTRIBUTORY NEG-
LIGENCE—QUESTION FOR JURY.  It is not contributory negligence *per
se* to fail to look and listen before driving across a street car track
at a city street crossing; and the question is for the jury where
the car was some distance away running at a high rate of speed,
and the wagon would have cleared the track if the car had slowed
down or been going at a reasonable rate of speed.

SAME—PROXIMATE CAUSE.  The contributory negligence of the
driver of a wagon in crossing a street car track at a city street
crossing will not preclude a recovery if the motorman could have
stopped the car in time to avoid the accident had it been going at a
reasonable rate of speed; since the right of way at the crossing is
not absolute, and the motorman's negligence was the proximate
cause.

APPEAL—REVIEW—NEW TRIAL—DISCRETION.  The denial of new
trial for insufficiency of the evidence, where it was palpably con-
flicting, is not an abuse of discretion, and will not be disturbed on
appeal.

Appeal from a judgment of the superior court for King
county, Gilliam, J., entered March 15, 1911, upon the ver-
dict of a jury rendered in favor of the plaintiff, in an action
for personal injuries sustained in a collision of a street car
with a wagon.  Affirmed.

*Morris B. Sachs* and *Will H. Thompson*, for appellant.

*Frank E. Green*, for respondent.

ELLIS, J.—Action by respondent against appellant for
damages, for personal injuries suffered by reason of a car

[1]Reported in 120 Pac. 534.

of appellant being run against respondent's wagon, on Rainier boulevard, at its intersection with Norman street, in the city of Seattle. It is claimed that appellant was negligent in running the car at a dangerous speed, and in not giving timely warning of its approach to the crossing. The trial was to a jury. At the close of respondent's evidence, appellant moved for a nonsuit, which was denied. Evidence for appellant was introduced, the cause submitted to the jury, and a verdict was returned in favor of respondent for $1,000. Appellant's motion for a new trial was overruled, and judgment was entered against appellant upon the verdict. This appeal was taken, and there are assigned as errors: (1) The court's refusal to grant a nonsuit; (2) the court's refusal to grant a new trial.

Touching the first assignment of error, appellant's sole contention is based upon a claim that the respondent was guilty of contributory negligence in failing to look for the car before driving upon the track. Rainier boulevard runs practically north and south, and Norman street east and west; they intersect at right angles. The appellant was operating a double-tracked street car line on the boulevard. There was a straight stretch of track from the Norman street crossing for about a quarter of a mile to the north, from which direction the car came, and along which the view from the crossing was practically unobstructed. The respondent, a man seventy years old, an expressman, was driving home late in the afternoon of May 18th, 1910, along the west side of the boulevard. He stopped and watered his horse at a watering trough at the intersection of Norman street with the boulevard. He then turned and started to drive across the street car tracks, and when almost across the first track upon which ran the south bound cars the back part of one of the rear wheels of his wagon was struck by a car, turning the wagon over, throwing the respondent out, rendering him insensible and inflicting the injuries complained of.

The respondent's testimony as to what occurred at the time was vague, confused and contradictory. It does not, however, evince a disingenuous attitude on his part, but rather a vague memory or a confused mind. His testimony as to the occurrence, eliminating much confused matter, was as follows:

"And I see no car coming until I was on the track, and then I see a car coming at a fearful rate of speed, and I tried to get the horse ahead, but it was too late. . . . Q. After your horse was up on the track as you say and the fore part of the wagon, and you saw the car coming, about how far was the car off then when you first saw it? A. Well, it was about three-quarters of a block. Q. And are those short blocks or long blocks, down there? A. They are pretty long blocks. Q. What did you do then when you saw the car first? A. Well, I tried my best to get the horse to get over quick; I thought I had plenty of time anyway, when I saw them coming at such a rate of speed. Q. Was it possible for you to back up then? A. No, that was impossible. Q. Would it have taken longer for you to back up than to go ahead? A. Yes, I don't think I could ever do it hardly. Horse fall down on the track doing that, I couldn't possibly do it, that is all. Q. You drove on ahead; did you urge your horse in any way to hurry? A. Yes, sir; I had not a whip in my hand, but I just took the reins this way (illustrating) and slapped him up, tried to get him to go ahead. Too late. Q. Did the horse go ahead? A. Yes, he was going ahead. Q. What happened? A. Well, just as I got clear of the further rail, the east rail, they hit the back of my wagon and broke the end all off of the wagon, and knocked me over towards the store about fifty feet or more, I guess, and I was right under the wagon. I didn't know any more, that is all."

On cross-examination he stated many times that he did not look up the track for the car until he was on the track, and once he said: "Why no, I don't remember that I did." On redirect examination he said: "Why yes, I looked that way I thought." And on recross he said: "I took a look around of course, before I went on the track." And when ques-

tioned again: "No, I didn't." From his whole testimony on the subject, it was manifest that he had no distinct memory of looking up the track in the direction from which the car came until he was on or nearly on the track. As to respondent's mental condition at the time of the trial, he testified, when asked as to the condition of his head since the accident:

"Well, it is not the same as it was before. I feel kind of pain very often in my head, and sleep—my sleep is not right, kind of dazed, something, I don't know."

A Mrs. Donovan, at whose house he had lived for about two years, and who nursed him at the time of the injury, testified:

"Well, as far as I can explain, when he goes to talk to you about anything he seems to do it as if his mind is away off from just what he wants to talk and he seems to forget himself."

Dr. De Soto, who had attended him regularly since the injury, testified:

"A. Well, getting worse and worse all the time; that is about it, seems to be getting weaker in both mind and body. I found that his head is affected through the injury which he received there, which is probably of course the contusion which was back here which affects the nerve— Q. (Interrupting) Back of the right ear? A. Back of the right ear, yes. Q. And what is the effect of that blow and contusion? A. Well, the only effect which I know now, from what I have treated him, would be a loss of hearing, but it may also mean that he will lose his mentality; treatment does not seem to do him any good. Q. He may lose his mind? A. Yes."

Dr. Silliman, who had examined respondent several times in consultation with Dr. De Soto, testified to practically the same condition.

In passing upon the motion for nonsuit, the trial court was justified in taking into consideration this evidence of a clouded mentality of the respondent when he testified. That

court could not say, nor can we, that the minds of reasonable men might not differ as to whether respondent's testimony showed conclusively that he failed to look before driving upon the track.

One C. D. Gaylor, an eyewitness, testified as follows:

"A. I just spoke to him, I says—he just watered his horse and turned away from the watering trough. I says, 'Hello, Bill,' I have known him for a long time. He says, 'I am going home,' and whirled around to cross the track. There is a little raise at the track, I should say six or eight inches, maybe, from the planking up across the track. I looks up and here was car up I should say two or three blocks away from there, and I looked up and saw the car coming; it was coming (illustrating)—all you could hear, whirling right through, and Bill turned his head that way and he commenced hitting the horse with the lines to get across. The car came and took the back end of the wagon and over it went. He didn't have time. If they had slacked up at all he would have got off."

He further testified that the car was going at the rate of 25 or 30 miles an hour; that it did not slacken its speed before it struck the wagon; that it went 30 or 40 feet before stopping after striking the wagon; that no bell was rung nor whistle sounded nor warning of any kind given. On cross-examination he testified:

"Q. Did you warn Mr. Morris? A. No, there was no time to. He was going across. I thought he had plenty of time to get across the track when he started to cross. When I saw him I thought he had plenty of time to get across the track."

Mrs. Katherine Dawson, another eyewitness, testified that the horse was just getting up onto the track when she first noticed it, and the car was then a good way up the track, and was running faster than usual; that it did not slacken its speed before it struck the wagon; that it pushed the wagon along "quite a piece," and passed on some distance

before it stopped; that she did not hear any bell nor whistle nor any alarm before the car struck the wagon.

C. Vietro, another eyewitness, testified that, when he first saw the respondent, the head of the horse was just going onto the track; that he saw the car at that time between fifty and one hundred yards away; that the car was going faster than usual, about twenty-five or thirty miles an hour; that it did not slacken speed before it struck the wagon; that it passed on twenty-five or thirty feet after it struck the wagon before it stopped and that he did not hear any bell nor any whistle nor any alarm of any kind.

One Frank Worth, a passenger on the car, testified that the car was "going very fast, very fast. Not less than twenty miles an hour." "I had never ridden at that speed, to my knowledge, on a street car, before." That the brake was applied so suddenly that it threw him over against the next passenger; that the collision occurred almost immediately on the application of the brake; that just before the brake was applied the motorman was holding conversation with a gentleman standing beside him; that after the car struck the wagon, it went thirty or forty, perhaps fifty feet before it was brought to a stop.

This court, in common with other courts, has held that the failure to look and listen before attempting to cross an electric street railway track at a regular street crossing in a city is not negligence *per se*. Assuming that respondent failed to look as soon as he might, still, under the circumstances shown by the evidence, the question of contributory negligence was one for the jury. *Roberts v. Spokane St. R. Co.*, 23 Wash. 325, 63 Pac. 506, 54 L. R. A. 184; *Burian v. Seattle Elec. Co.*, 26 Wash. 606, 67 Pac. 214; *Traver v. Spokane St. R. Co.*, 25 Wash. 225, 65 Pac. 284; *Chisholm v. Seattle Elec. Co.*, 27 Wash. 237, 67 Pac. 601.

In *Shea v. St. Paul City R. Co.*, 50 Minn. 395, 52 N. W. 902, the facts were almost identical with those here pre-

sented. The plaintiff's failure to look for the car till he was upon the track was urged as negligence *per se*. The court said:

"The fallacy in this, which runs all through counsel's argument, is in assuming that the degree of care required at the crossing of a highway and an ordinary steam railroad is the test of the care required in crossing the track of a street railroad on a public street. The two cases are not alike. In the first place, street cars do not, or at least ought not to, run at the same rate of speed, are not attended with the same danger, and are not so difficult to stop quickly, as those of an ordinary railroad. In the next place, the cars of a street railway have not the same right to the use of the track over which they travel. . . . It would be inexpedient to attempt any complete enumeration of the modifications of or exceptions to the general rules of equality of rights between street cars and other vehicles used on a street. But it is certain that there is no modification or exception that relieves a street railway company from exercising, at least, as much care to avoid collisions with other vehicles as the owners of the latter are required to exercise in order to avoid collisions with the cars."

The following cases are also closely analogous: *Robbins v. Springfield St. R. Co.*, 165 Mass. 30, 42 N. E. 334; *Lawler v. Hartford St. R. Co.*, 72 Conn. 74, 43 Atl. 545; *Springfield City R. Co. v. Clark*, 51 Ill. App. 626; *Dennis v. North Jersey St. R. Co.*, 64 N. J. L. 439, 45 Atl. 807; *Citizens' Rapid Transit Co. v. Seigrist*, 96 Tenn. 119, 33 S. W. 920; *Memphis St. R. Co. v. Riddick*, 110 Tenn. 227, 75 S. W. 924.

It was immaterial whether he looked or not, if he, as a reasonably prudent man, would have been justified in trying to cross, had he looked before starting to cross, and had he then seen the car where he and his other witnesses said it was, even after he was partially on the track. All of these witnesses concur in saying that had the car been running at a usual rate of speed he would have had plenty of time to cross. Under the evidence the question as to whether he was negligent in failing to look before starting to cross the track

was plainly one for the jury. *Burian v. Seattle Elec. Co.,* *supra; Nappli v. Seattle, Renton & S. R. Co.,* 61 Wash. 171, 112 Pac. 89.

Moreover, even assuming that the respondent was negligent as a matter of law, that would not preclude his recovery unless that negligence was the proximate or efficient cause of the injury. On this straight stretch of track, it is obvious that, if he could have seen the car in time to stop, the motorman on the car could have seen him in time to stop the car if it was going at a reasonable rate of speed. If the testimony of the respondent and of the other witnesses to which we have referred was true, as must be assumed on motion for nonsuit, then the car was at least one hundred and fifty or two hundred feet away when respondent drove upon the track. To one watching him, his intention to cross must have been apparent when the car was even farther away. The appellant had no absolute right of way at the crossing. Its right was no greater than that of the respondent. Their rights and duties were reciprocal. Whether the motorman could have seen the respondent's danger in time to stop the car was a question of fact. If he could, it was his duty to do so, regardless of any negligence of respondent, and the failure to do so was the proximate cause of the injury. These were questions for the jury. *Heinel v. People's R. Co.,* 6 Penn. (Del.) 428, 67 Atl. 173; *Powers v. Des Moines City R. Co.* (Iowa), 115 N. W. 494; *Atwood v. Bangor etc. R. Co.,* 91 Me. 399, 40 Atl. 67; *Baltimore Consol. R. Co. v. Rifcowitz,* 89 Md. 338, 43 Atl. 762; *Weitzman v. Nassau Elec. R. Co.,* 33 App. Div. 585, 53 N. Y. Supp. 905. The motion for nonsuit was properly overruled.

The case of *Fluhart v. Seattle Elec. Co.,* 65 Wash. 291, 118 Pac. 51, is clearly distinguished from the case here upon the facts. There the accident was not at a street crossing. The plaintiff saw the car, and had ample time to stop. He was a pedestrian and had no team to distract his attention.

The appellant's motion for a new trial was also properly denied. It is plain from our analysis of the evidence produced on respondent's part that it was ample to take the case to the jury on the question of appellant's negligence, both as to a negligently dangerous rate of speed and as to the failure to ring the bell or give other warning. It would be useless to review the appellant's evidence in detail. It positively contradicted the respondent's evidence on every material point. The appellant's contention is that a new trial should have been granted on the ground of insufficiency of the evidence to sustain the verdict. No question is raised on the court's instructions. The trial court had the right to, and is presumed to have considered the weight of the evidence. He saw the witnesses and heard them testify. He has expressed no doubt as to the sufficiency of the evidence to sustain the verdict. The motion was necessarily addressed to his discretion. Where the evidence is so palpably conflicting as that here presented the case is one for the jury. It was no abuse of discretion to refuse a new trial.

The judgment is affirmed.

DUNBAR, C. J., CROW, CHADWICK, and MORRIS, JJ., concur.