[No. 23194. Department One. November 23, 1931.]

C. W. WHITE, *Appellant,* v. SHAFER BROS. LUMBER & DOOR COMPANY, *Respondent.*[1]

*J. O. Davies* (*Elmer S. Smith,* of counsel), for appellant.

*W. H. Abel* and *Don G. Abel,* for respondent.

PARKER, J.—The plaintiff, White, commenced this action in the superior court for Lewis county seeking recovery from the defendant company for personal injuries which he claims he suffered as the result of the negligence of the company in the manner of maintaining its sawmill plant at Dryad, in that county.

[1]Reported in 5 P. (2d) 520.

One of the company's defenses is that in the maintenance and operation of its plant it was, at the time in question, engaged in an extrahazardous industry; that White was then in its employ at its plant, engaged in extrahazardous employment; that he was injured in the course of that employment; and that therefore he is entitled to relief, if any, only under our workmen's compensation law.

The cause proceeded to trial in the superior court for Lewis county, sitting with a jury. At the conclusion of the evidence introduced in behalf of White, counsel for the company moved the court for judgment of dismissal, upon the ground, among others, that White was at the time in question "an employee protected by the workmen's compensation act." This motion was by the court granted and judgment of dismissal rendered accordingly, from which White has appealed to this court.

The arrangement of the company's plant is shown by a plat made by an engineer witness for White, and, so far as need be here noticed, is substantially as follows: Running north and south through the plant there is the usual carriage and carriage track passing the head saw. Along the west side of the track, on a level slightly lower than the floor of the carriage, runs a board walk, some seventy feet long and thirty inches wide. Running east and west, approximately at right angles to the carriage track and this walk and under them, is a sawdust and refuse conveyor. It is about eleven feet deep, having sloping sides. It is about eleven feet wide at the top and about two feet wide at the bottom. It has a chain with cross cleats attached running along the bottom to carry the sawdust and refuse away.

From the floor of this walk down to the bottom of the conveyor there is a drop of a little more than

eleven feet. There is no railing protection along this walk where it passes over the conveyor. The carriage track is also open at that place. From the northerly end of this walk there is a connecting walk running east some twenty feet to the filing shed.

Aside from the plat and the testimony of the engineer explaining it, we have in this record only the testimony of White himself. We quote from his testimony touching his employment relation with the company as follows:

"Q. What has been your business? A. Circular saw filer, fifteen or eighteen years. Q. Did you ever work for the defendant? A. I did. Q. How did you come to go to work for defendant? A. Lewis Johnson, their head filer, came over to Aberdeen and offered me the job. Q. Whereabouts did you go to work? A. At Dryad, in their lumber mill, at $6.00 a day. Q. What position did you take? A. Night filer. Q. Who was boss over the night filer? A. The day filer, the head filer. Q. What shift did you work in? A. On the night shift. Q. Did Mr. Johnson work there as head filer all the time you worked there? A. Yes. Q. What time of the day would you get off shift? A. Two o'clock in the morning. Q. When you got off at two o'clock in the morning, what did you do? A. I would go home and go to bed. Q. What time would you get up? A. About 11 o'clock in the morning. Q. What would you do then? A. Have dinner about that time. Q. How long did you work there at Dryad? A. About nine months. Q. What was the last shift you went to work? A. October 30. Started at 5 o'clock. Q. During the time you were there on this night shift, did you ever work any on the day shift? A. I have. Q. How did you come to work on the day shift? A. Well, Mr. Johnson asked me one day what I did afternoons and I told him nothing in particular, and he told me if I was not doing anything I might drop down at the mill in the afternoons because he might be able to give me extra work. He had extra work to do sometimes and needed extra help. Q. How often did you drop down there to ask Mr. Johnson if he had extra work for you? A. Per-

haps every other day. Q. On the afternoon of October 31, you went to the mill, what time of the day did you go? A. About 2:30 in the afternoon. Q. How long had it been since you worked on day shift? A. I think it had been two days. Q. What part of the plant did you go to first, if any? A. I went to the filing shed. Q. Did you find Mr. Johnson in the filing room? A. I didn't. Q. Where did you go? A. I went on through the filing room out this walk [meaning the walk leading from the filing shed above mentioned] and then went out this other walk [meaning the walk along the carriage track]. Q. Whereabouts is that? A. Out to the end here [meaning the southerly end beyond where the walk passes over the conveyor]. Q. Why did you go out there? A. I was looking for the filer. Q. Had you on other occasions when you failed to find Mr. Johnson in the filing room gone out there looking for him? A. I have. On several occasions and found him out there. Q. State whether or not the duties of the filer are performed in the filing room alone. A. It is his duty to file the saws and also to go over the mill to various places where the saws are operated and see if they are running properly, and the like of that. Q. Did you find Mr. Johnson out there? A. No, I didn't. Q. When you failed to find Mr. Johnson out there, what did you do? A. I stood there perhaps two or three minutes and started back to the filing room. Q. What then happened? [Here follows White's testimony describing his meeting on the walk, just over the conveyor, another employee of the mill, and in their attempt to pass each other his falling off the walk into the conveyor some eleven feet below and receiving the injuries of which he complains.]''

His testimony further shows that he worked extra time during the day shift on thirteen different days during the month of October, he having been injured on the 31st of that month.

It is plain that the company was, at and for a long time prior to the day on which White was injured at its plant, engaged in extrahazardous industry in the maintenance and operation of its plant. It is equally

plain that White, while he was working for the company at its plant, was engaged in extrahazardous employment within the meaning of our workmen's compensation law. See § 7673 and following, as amended by Chapter 310, Laws of 1927, p. 114, and Chapter 132, Laws of 1929, p. 325. Rem. Comp. Stat., § 7679, as so amended, reads as follows:

"Each workman who shall be injured whether upon the premises or at the plant, or he being in the course of his employment, away from the plant of his employer, or his family or dependents in case of death of the workman, shall receive out of the accident fund compensation in accordance with the following schedule, and, except as in this act otherwise provided, such payment shall be in lieu of any and all rights of action whatsoever against any person whomsoever."

So, our present problem is, was White injured in the course of his employment? If he was so injured, then he can look for relief only to the accident fund provided by our workmen's compensation law. He does not come within any of the exceptions in the act otherwise provided.

Counsel for White rests his claim of recovery directly from the company upon "the theory that at the time he received his injuries he was an invitee and that the action is not based upon the relationship of master and servant." We quote from his counsel's opening brief filed in this court. It is argued that, when White went to the plant from time to time during the afternoons to offer his services to work on the day shift, he then did so as a stranger seeking employment, and that, until he actually commenced working on the day shift following each of those visits, he was not doing anything in the course of his employment.

It seems to us that his employment relation to the company should not, under the circumstances here appearing, be viewed as being so restricted. He was

not only a regular employee of the company working during the night shifts, but, by express request of his superior acting for the company, he came to the place of his work occasionally during the day shifts to then work extra time, if there was then need for his help, as there very often proved to be. We have seen that he was injured on October 31, and that he had worked on the day shifts on thirteen different days during that month. When he went to the company's plant on October 31 and looked for Mr. Johnson, the head filer, at places at the plant where he had on previous occasions found him, this with a view of offering to work extra time on the day shift, it seems plain to us that he was proceeding in the course of his employment.

In *Indian Hill Club v. Industrial Insurance Commission,* 309 Ill. 271, 140 N. E. 871, the court was called upon to determine the rights of a golf caddy employed at the club, as to his claim, under the Illinois workmen's compensation law, for injuries he received while upon the grounds of the club. It appears that each day when he went to the club to work as a caddy he had no positive assurance that he would be then put to work, though, like White in this case, he was very often put to work on the days he so presented himself. He was one of about a hundred caddies regularly, daily assembled there for work. The order of putting them to work was determined by lot, and a list of their names made up each day accordingly, in order, with a view that they be called to work in that order.

The claimant's name was, on the day in question, near the end of the list, which made it questionable as to whether or not he would be called to work at all that day. The claimant, seeing that his number was near the end of the list for that day, at about ten o'clock started to go home, and, while on his way and still upon the club grounds, was struck by an auto-

mobile and injured, for which he claimed compensation under the Illinois workmen's compensation law, the club and its caddy employees being under that law, as it was held in that case. Holding that the claimant was entitled to such compensation, Justice Dunn, speaking for the court, said:

"It is also contended that the injury did not occur in the course of the employment and did not arise out of it. The defendant in error, having waited until he saw there was no immediate prospect of his services being needed, was leaving the grounds of the club, and while doing so, but still on the grounds and about thirty feet from the clubhouse, was injured. It is not essential to the right to receive compensation that the employee should have been working at the particular time when the injury was received. The employment is not limited to the exact moment when he begins work or when he quits work. (*Wabash Railway Co. v. Industrial Com.*, 294 Ill. 119.) [128 N. E. 290.] An injury accidentally received on the premises of the employer by an employee while going to or from his place of employment by a customary or permitted route, within a reasonable time before or after work, is received in the course of and arises out of the employment. *Porter Co. v. Industrial Com.*, 301 Ill. 76 [133 N. E. 652]; *Western Coal Co. v. Industrial Com.*, 296 Ill. 408 [129 N. E. 779]; *Wabash Railway Co. v. Industrial Com., supra; Schweiss v. Industrial Com.*, 292 Ill. 90 [126 N. E. 566]."

That decision seems to us to be directly in point in our present inquiry. In harmony with that decision, we have held that it is not necessary that an employee in an extrahazardous employment must necessarily be actually at work, when injured, in order to be considered as "injured in the course of his employment;" that is, his injury may be so intimately related to his employment as to call for the holding that he was "injured in the course of his employment," though not then actually at work or within his actual working

hours. *Wabnec v. Clemons Logging Co.,* 146 Wash. 469, 263 Pac. 592; *Burchfield v. Department of Labor & Industries, ante* p. 106, 4 P. (2d) 858.

Among the decisions of other courts so holding, we note: *Milwaukee v. Althoff,* 156 Wis. 68, 145 N. W. 238, L. R. A. 1916A, 327; *Honaker & Feeney v. Hartley,* 140 Va. 1, 124 S. E. 220; *United Dredging Co. v. Lindberg,* 18 Fed. (2d) 453.

We conclude that the judgment must be affirmed. It is so ordered.

TOLMAN, C. J., MITCHELL, and BEELER, JJ., concur.

MILLARD, J., concurs in the result.

### ON REHEARING.

[*En Banc.* March 14, 1932.]

PER CURIAM.—Upon a rehearing *En Banc,* a majority of the court adheres to the Departmental opinion heretofore filed herein. The judgment is therefore affirmed.