[No. 30188.  *En Banc.*  May 27, 1948.]

LAWRENCE F. MATHEWS, *Respondent,* v. LORD ELECTRIC COMPANY *et al., Appellants.*[1]

[1]Reported in 194 P. (2d) 379.

*Horrigan & Leavy,* for respondent.

*Moulton & Powell* and *Thomas B. Gess,* for appellants.

SCHWELLENBACH, J.—This is an appeal from an order granting a new trial in a personal injury action, tried to a jury. At the close of the plaintiff's case, the defendants moved for a nonsuit on the ground that, under the evidence, the plaintiff was guilty of contributory negligence, as a matter of law. The motion was denied. At the close of the case, the defendants moved for a directed verdict on two grounds; first, that, under the evidence, the plaintiff was guilty of contributory negligence as a matter of law; and second, that the plaintiff and the agent of the defendants (the driver of the truck who struck the plaintiff) were both engaged in extrahazardous employment and covered by industrial insurance at the time and place of the accident, and that, therefore, under Rem. Rev. Stat. (Sup.), § 7675 [P.P.C. § 709-1], the plaintiff was limited to his claim for industrial insurance. This motion was denied.

The jury returned a verdict for the defense. The plaintiff presented a motion for a new trial. The motion was granted by a general order without the giving of any reasons therefor. Error is assigned in denying the motion for nonsuit; in denying the motion for a directed verdict; and in granting the motion for a new trial. We shall discuss only such evidence as we consider pertinent to the claimed errors.

The accident occurred September 2, 1944, at Hanford, Washington, which was one of the principal towns in the vast Hanford Atomic Project during the war, comprising many miles in area. At the time in question, there were between forty and fifty thousand people in Hanford. Another large town within the project was Richland. There is no direct testimony as to the distance between Hanford and Richland, but it took about an hour to travel between

the two communities by bus. In ruling on the motion for a directed verdict, the trial court mentioned the distance between the two towns as thirty miles.

The duPont Company was the general contractor over the Hanford project. Newberry, Chandler and Lord Company was the electrical subcontractor under duPont. Respondent was employed by duPont as a fire inspector. Alonzo E. Hunter, who drove the truck which struck respondent, was employed by Newberry, Chandler and Lord. Both men were engaged in extrahazardous occupations. At the time in question, both duPont and Newberry, Chandler, and Lord had paid to the state of Washington all required industrial insurance rates. Both men were, therefore, covered by the workmen's compensation act, and the sole question is whether or not, at the time of the accident, the respondent was acting within the scope of his employment.

Respondent lived at Hanford, and ordinarily worked there. However, for three or four weeks prior to the accident, he had been assigned to the Richland detail. His regular hours were from 8:00 a.m. to 6:00 p.m. He would take the 6:50 a.m. bus from Hanford, arriving at Richland about 8:00 o'clock.

Friday, September 1, 1944, was the regular weekly pay day. The firemen, stationed at Hanford, were paid at the fire station in Hanford at about a quarter to eight, before they started to work. Respondent was not paid on that day, being then on the bus en route to Richland. On Saturday, September 2nd, he went to Richland, as usual, arriving about 8:00 o'clock. He worked until 9:00, and then took the 9:15 bus back to Hanford, arriving at the bus depot about 10:15. The check had been transferred from the fire station to the time office, which was across the street from the bus depot, and it was while going across the intersection that he was struck and injured by the truck.

His purpose in going back to Hanford was to get his pay check, and then wire some money to his wife. When he left Richland, he was not under instructions of the company; he did not have permission to leave and did not leave word with anybody as to where he was going, although he was re-

quired by company regulations to do so. His explanation was that no one was around, and that he was in a hurry. Although he did not work any more the day of the accident, September 2nd, he was paid for a full day's work.

Appellants rely upon *Welden v. Skinner & Eddy Corp.,* 103 Wash. 243, 174 Pac. 452, where a carpenter working on the construction of a shipbuilding plant was injured while on his way to the toilet. It was held that he was injured within the course of his employment; *Burchfield v. Department of Labor & Industries,* 165 Wash. 106, 4 P. (2d) 858, where a stevedore was employed to work with a crew at different ports. We held that he was within the course of his employment while driving his own automobile between ports in order to arrive there ahead of his ship and assist in mooring her; *White v. Shafer Bros. Lbr. & Door Co.,* 165 Wash. 298, 5 P. (2d) 520, 8 P. (2d) 1119, where an employee of a mill was held to have been injured in the course of his employment. He came to the mill afternoons to get extra work that was sometimes offered and was injured while seeking information about the work; *Hobson v. Department of Labor & Industries,* 176 Wash. 23, 27 P. (2d) 1091, where the workman was sent out with a speeder to get supplies.

Other cases relied upon by appellants are *Morris v. Department of Labor & Industries,* 179 Wash. 423, 38 P. (2d) 395, where the injured person had called on a customer at a theater. We said:

"The fact that appellant attended the show in company with the young lady and the fact that he afterwards took her home, we regard as wholly immaterial. The accident occurred after appellant had resumed his homeward trip, and upon the very road that he would have taken had his return trip been made immediately after seeing the prospective customer. The particular mission upon which he had been directed contemplated a trip to White Center and return. Although the mission had been temporarily interrupted, it had not been completed at the time that the accident occurred. During the time of his actual return in completion of his mission, appellant was still in the course of his employment."

In *Church v. Department of Labor & Industries,* 179 Wash. 443, 38 P. (2d) 234, we held:

"From the record before us, we hold that the trial court properly found that Mr. Church, at the time he was injured, was on his way to his home to procure an appliance with which he intended to immediately return to the bridge, the appliance to be then used, if possible, in making the proper and necessary repair. It follows that the deceased, at the time he was injured, was in the course of his employment (*Hobson v. Department of Labor and Industries,* 176 Wash. 23, 27 P. (2d) 1091) and that the trial court was justified in finding that, on the record, it should be held that the statutory presumption in favor of the joint board had been overcome."

In *MacKay v. Department of Labor & Industries,* 181 Wash. 702, 44 P. (2d) 793, a workman employed by the hour to operate his own tractor was injured while taking a part of the engine to a garage for repairs. We held that he was within the course of his employment, saying:

"The caterpillar became disabled on the job. The job was to be done. The claimant did the natural and proper thing in taking the disabled part at once to the nearest place where it could be repaired to enable him, as speedily as possible, to do the work for which he was hired. We think this was incidental to his employment, even though the aggregate amount of his pay was to be determined by the time during which the machine was in operation. The compensation of two dollars an hour took into account, of course, wear and tear as well as loss of time and expense involved in making the casual repairs necessarily incidental to its operation."

In all of the cases relied upon by appellants, the facts were clear that, at the time of the accident, the injured workman was within the scope of his employment.

Respondent relies upon *Hill v. Department of Labor & Industries,* 173 Wash. 575, 24 P. (2d) 95. There, the plaintiff, a street car operator, took his car from the barn and proceeded upon his regular schedule. Passing the post office, he left his car for the purpose of depositing a letter in a public mail box in front of the building. While crossing the street on his return to his car, he was struck and injured by an automobile. In holding that the workman was not within

the scope of his employment, we quoted from *Hama Hama Logging Co. v. Department of Labor & Industries,* 157 Wash. 96, 288 Pac. 655, as follows:

" 'It follows that an employee, injured at a time when he is doing something solely for his own benefit or accommodation, and not while engaged in or furthering his employer's business, is not injured "in the course of his employment." ' "

And, from *Hoffman v. Hansen,* 118 Wash. 73, 203 Pac. 53:

"Situated and engaged as he was at the time of the accident, it cannot be said, upon a liberal construction of the act, that he was upon the premises or at the plant of his employer. He was upon the sidewalk and street, in a sense entirely disassociated from the street railroad and its service. Nor can it be said that, while thus away from the plant of his employer, he was in the course of his employment. At the time he was injured, he was engaged in the exercise or pastime of walking, and was no more in the course of his employment than if, at that time, he had been away engaged in the exercise or pastime of boating or automobiling. The complaint being that his injuries were due to the negligence or wrong of another, who it appears was not in the same employ, and it appearing he was injured at a time he was not in the course of his employment and was away from the plant of his employer, it follows that the provisions of the act requiring him to elect whether to take under the act or seek a remedy against such other, and that such election shall be in advance of any suit under this section, is not applicable."

In *Young v. Department of Labor & Industries,* 200 Wash. 138, 93 P. (2d) 337, 123 A. L. R. 1171, the workman was employed as a common laborer at the Grand Coulee Dam. On the day in question, after eating his lunch, he was exploring the interior of the dam and was injured. In holding that he was not in the course of his employment, we quoted from 71 C. J. 658, § 404, as follows:

" 'An injury to an employee arises in the course of his employment when it occurs within the period of his employment, at a place where he may reasonably be, and while he is reasonably fulfilling the duties of his employment or engaged in doing something incidental to it.' "

And said:

"The test adopted by this court for determining whether an employee is, at a given time, in the course of his employment, is whether the employee was, at the time, engaged in the performance of the duties required of him by his contract of employment, or by specific direction of his employer; or, as sometimes stated, whether he was engaged at the time in the furtherance of the employer's interest. *McGrail v. Department of Labor & Industries,* 190 Wash. 272, 67 P. (2d) 851, and cases therein cited. . . .

"In this case, it is manifest that appellant's venture had no connection whatever with his meal. He was not seeking a place where he might eat, nor was he returning to work from a place where he had eaten. He had finished his lunch without any mishap and had entered upon a wholly separate and distinct undertaking. When he began his exploration of the interior of the dam, he was not under the supervision or control of his employer, but was on his own time. He was not then engaged in the performance of any of his obligatory duties or anything incident to them. He was not performing a task in furtherance of his employer's work or interest, but was engaged in a voluntary exploration of his own conception. We are satisfied that appellant was not in the course of his employment, within the meaning of the workmen's compensation act."

In *Waddams v. Wright,* 21 Wn. (2d) 603, 152 P. (2d) 611, in discussing the phrase, "in the course of his employment," we said:

"In applying the phrase, we have adopted the view that it relates to the time, place, and circumstances under which the workman was injured. If, at the time of his injury, he was engaged in or was furthering his employer's business, in that he was performing some duty required of him by the contract of employment, that would be in the course of his employment; but, if he was injured at a time when he was doing something solely for his own benefit or accommodation, he would not be."

In *D'Amico v. Conquista,* 24 Wn. (2d) 674, 167 P. (2d) 157, we laid down the following requirements:

"Under our workmen's compensation act, definite conditions must exist at the time of an injury in order to entitle one to the benefits of the act. First, the relationship of employer and employee must exist between the injured

person and his employer (except in some cases where the injured person is an independent contractor); second, the injured person must be in the course of his employment; third, that the employee must be in the actual performance of the duties required by the contract of employment; and, fourth, the work being done must be such as to require payment of industrial insurance premiums or assessments."

We then said:

"This court has repeatedly held that the test of the relationship of employer and employee is the right of control on the part of the employer over the employee."

In the case at bar, under the authorities cited, had respondent been injured on Friday, September 1, 1944, while going across the street in Hanford to get his pay check at the fire hall, we could hold that he was in the course of his employment, but here he was on a project of his own, not in the interest of his employer, and without his employer's knowledge or consent. Respondent, at the time and place of the accident, was not covered by industrial insurance.

In *Fritz v. Horsfall,* 24 Wn. (2d) 14, 163 P. (2d) 148, we held:

"The rule in those cases in which the order granting a new trial is general and does not specify the grounds upon which it was rested will not be disturbed by this court unless it finds that the evidence was not sufficient to warrant the court in submitting the case to the jury. The rule is well stated in the following excerpt from *Henry v. Larsen,* 19 Wn. (2d) 690, 143 P. (2d) 841:

" 'Where the order granting the motion for a new trial is general and does not specify the ground or grounds upon which it was based, our inquiry is limited to the determination of the question whether the evidence was sufficient to take the case to the jury. *Hobba v. Postal Telegraph Co., ante* p. 97, 141 P. (2d) 648. Unless we can say in such case that the verdict of the jury was, as a matter of law, the only verdict that could be rendered, the order granting a new trial must be affirmed.'

"Under the above rule it becomes necessary to examine the statement of facts and the numerous exhibits admitted in evidence. In doing so it will be necessary to give full credit to the evidence favorable to respondent and the reasonable inferences to be deduced therefrom."

The issue is thus presented as to whether or not respondent was guilty of contributory negligence as a matter of law.

The accident occurred at the intersection of Division street and B avenue, in Hanford. Division street is fifty feet wide and runs north and south. B avenue is forty feet wide and runs east and west. There is a light signal hanging in the air over the middle of the intersection. It is the usual red and green automatic light signal. Respondent arrived at the bus depot on the southeast corner of Division and B about 10:15 a.m. It was warm and dry; visibility was good. Hunter approached the intersection while traveling south on Division. When both Hunter and respondent arrived at the intersection, the red light was showing. When it switched to green, respondent started north on the pedestrian lane of Division across B, and Hunter started south on Division across B. However, Hunter signaled a left turn and turned left, thus heading towards the lane where respondent was walking. They met after respondent had gone about twenty feet.

Respondent testified that the truck was ten feet away when he first noticed it; that he did not have time to jump forward or backward, and that he jumped up, trying to get on top of the hood; that he was thrown eighteen feet by the impact. Under cross-examination, he testified:

"Q. Did you see the truck at all before it was 10 feet away from you? A. No. Q. This is the first time you saw it? A. Yes, sir. Q. What, if anything, did you do to observe the truck before that? A. I don't recollect. Q. You don't recollect you looked at all until it was 10 feet away? A. I was intent on going across B Avenue. Q. You don't know where the truck was before that? A. No, sir. . . . Q. Was there anything that would have prevented you from seeing this truck before this time? A. That I couldn't say."

The only other witness to the accident who testified at the trial was Hunter, the truck driver. He testified that, as he approached the intersection, the signal was red, and he stopped. When it turned green, he started forward, gave a left turn signal, and started to make a left turn. There were no cars ahead of him, and no cars coming from the opposite

direction. Before he completed the turn, he collided with the respondent. The first time he saw the man was when he hollered. He did not see him at any time before he struck him. He did not blow the horn.

Henry E. Brinkman, who, at the time of the trial, was employed by the Pacific Greyhound Lines at Sacramento, California, testified on behalf of the defendants. At the time of the accident, he was employed at the Hanford project as sergeant of the patrol. Respondent and Hunter came into the office September 2, 1944, at about 4:00 p.m. As to respondent's statements on that occasion, he testified:

"A. He said he was crossing the street from south to north on Division and B, he was possibly distracted or something and had walked into the front end of Mr. Hunter's automobile. Q. What did he say about Mr. Hunter's fault? A. He said he didn't think it was Mr. Hunter's fault."

This testimony was denied by respondent.

Appellant relies upon *Silverstein v. Adams*, 134 Wash. 430, 235 Pac. 784, where we said:

"It thus appears from the respondent's own testimony that he was struck by the automobile just as he stepped from the curb to the street to cross to the Frye hotel. He says he looked to the left and did not see the car approaching. The lights of the automobile were burning and there was nothing to prevent his seeing the approaching car had he looked. If he had testified that he saw the car and nevertheless stepped into the street regardless of it and was struck, clearly he could not recover. The evidence shows that it was the right front of the car that struck him. A number of times this court has held that, when a person testifies that he looked and did not see an object, which plainly he could have seen, that he will not be heard to say that he looked and did not see. In other words, the situation is the same as though he had looked and seen the object. In principle this case cannot be distinguished from *Helliesen v. Seattle Electric Co.*, 56 Wash. 278, 105 Pac. 458; *Fluhart v. Seattle Electric Co.*, 65 Wash. 291, 118 Pac. 51; *McEvilla v. Puget Sound Tr., L. & P. Co.*, 95 Wash. 657, 164 Pac. 193; *Herrett v. Puget Sound Tr., L. & P. Co.*, 103 Wash. 101, 173 Pac. 1024. Under the rule of those cases, it must be held that the respondent was guilty of contributory negligence as a matter of law and this bars his recovery."

That accident occurred in Seattle, on October 28, 1923, at about ten o'clock p.m. There is nothing in the opinion to indicate that there were traffic signals at the intersection, nor is there any statement as to the relative rights of the parties at the place in question.

*Davis v. Riegel,* 182 Wash. 1, 44 P. (2d) 771, involved an accident at the intersection of First avenue and Cedar street, in Spokane. There were no automatic signal lights at that point. We said:

"An ordinance of the city of Spokane, subject to the duty to comply with the direction of traffic officers and automatic signal lights, provided that:

" 'Pedestrians shall have the right of way over vehicles at street intersections and crossings;' and further provided that it should be the duty of the driver of any vehicle to keep in mind continuously the rights of pedestrians at street intersections and crossings, and, whenever necessary, to accord the pedestrian the right of way. That Baldwin was guilty of negligence in not yielding the right of way to the appellant or sounding his horn or giving any other warning cannot be doubted, and we do not understand it to be seriously contended to the contrary.

"The principal contention made to sustain the judgment notwithstanding the verdict is that the appellant was guilty of contributory negligence as a matter of law. When she started to cross the street, the automobile was probably 150 or 160 feet from the south line of the intersection. Assuming that she did not look to the south, and that, if she had looked, she could have seen the automobile, she is charged with notice of what she would have seen, had she looked. The situation would be the same as though she had looked and seen the automobile. *Silverstein v. Adams,* 134 Wash. 430, 235 Pac. 784. It is immaterial whether she looked or not, if, as a reasonably prudent person, she would have been justified in trying to cross had she looked before starting. *Morris v. Seattle, Renton & Southern Ry. Co.,* 66 Wash. 691, 120 Pac. 534.

"If she had looked and seen the automobile, she would have had a right to assume that the driver thereof would not violate the city ordinance with reference to yielding the right of way to pedestrians upon a crossing, and that he would, if he was not going to yield the right of way, have sounded his horn or given her some other warning so that

she would have gotten out of the way. *Franey v. Seattle Taxicab Co.*, 80 Wash. 396, 141 Pac. 890."

The reason for the rule adopted in the *Silverstein* case was well stated in *Jones v. Wiese*, 88 Wash. 356, 153 Pac. 330, where we said:

"When about to attempt a street crossing at such a place where danger is imminent and constant, pedestrians must take some precautions to guard against it. Something must be done to insure safety, and the failure to do so is such negligence as will prevent recovery in case of injury. As was said in *Cole v. Northern Pac. R. Co.*, 82 Wash. 322, 144 Pac. 34:

" 'It is not necessary to here say what precautions are necessary. It cannot be denied that something must be done to insure safety.'

citing cases announcing the rule in similar language."

*Gable v. Field,* 189 Wash. 526, 66 P. (2d) 356, was a case involving an accident at an intersection controlled by automatic traffic signals. The pedestrian had reached a safety island in the center of the intersection. When the light turned green, she looked to the right and left, and started across the street. She did not look to the rear and was struck by an automobile coming from that direction. In discussing an instruction given by the trial court, we said:

"The first assignment charges error in giving instruction No. 12, as follows:

" 'It is the duty of one stepping into the street to exercise reasonable care in looking to see if vehicular traffic is approaching in sufficient proximity to constitute danger, and you are instructed in this respect that under the particular conditions and circumstances existing at the intersection in question, *it was plaintiff's duty to exercise reasonable care in looking to see whether or not traffic was approaching from her right rear* before proceeding to cross from the island in said street intersection northward to the curb, and if you find that she did not exercise reasonable and ordinary care in this particular and that her failure to do so materially and proximately contributed to cause the collision between herself and the automobile of the defendants, then I charge you that she can not recover and your verdict must be for the defendants.'

"We have italicized the words, as counsel has, to indicate

the attack made upon the instruction. The contention of appellant in this respect is that a pedestrian owes no duty to keep a lookout to the rear; that the law places that burden directly upon the motorist.

"That part of the instruction is erroneous and prejudicial. It is never the duty of a pedestrian, who has obeyed the legal traffic signals and entered a lawful pedestrian cross walk in a street intersection, who has looked to the right and left, to also look to the rear. She had the right of way across. As to such well defined crossings, the burden is placed by statute and ordinances upon the motorist. In this case, appellant, the pedestrian, had certainly complied with the law and taken proper precautions for her own safety."

The statute governing traffic which is controlled by traffic control signals is Rem. Rev. Stat., Vol. 7A, § 6360-98 [P.P.C. § 295-47], as follows:

"Whenever, at any point, traffic is controlled by traffic control signals exhibiting the words 'Go,' 'Caution,' or 'Stop' or exhibiting different colored lights, the following words or colors only shall be used and shall indicate as follows:

"Green, or the word 'Go,' under which circumstances vehicles facing such signal may proceed through the section of traffic control or turn right or left unless a sign at such point indicates such turns to be prohibited. Upon such signal exhibiting green or the word 'Go' vehicles shall yield the right of way to other vehicles and to pedestrians lawfully in the intersection controlled area immediately prior to the time such signal is exhibited and shall permit them to proceed from the controlled area. It shall be unlawful for any pedestrian to enter or cross the roadway in that portion of the controlled area through which vehicles are directed to proceed by such exhibited green light or such word 'Go';

"Red or the word 'Stop,' under which circumstances vehicles facing the signal shall stop before entering the nearest vehicle or pedestrian allocated portion of the controlled area or such other point as may be indicated by a clearly visible line or other marker and shall remain standing as long as such traffic control signal shall exhibit red or the word 'Stop';

"Pedestrians may cross the roadway within any marked or unmarked cross walk within that portion of the controlled area at the entrance to which vehicles are directed to stop and remain standing by the exhibited red light or word, 'Stop';

"Red or with word 'Stop' and green directional arrow under which circumstances traffic facing the signal shall stop before entering the nearest pedestrian or vehicle allocated portion of the controlled area or such other point as may be indicated by clearly visible line or other marker and then may proceed for the purpose only of making the movement indicated by the directional arrow and then only with the exercise of due caution and if the same can be done without interfering with other traffic or endangering pedestrians lawfully within the controlled area;

"Red intermittent flashing light under which circumstances vehicles facing such light shall come to a complete stop before entering such controlled area;

"Yellow alone or with the word 'Caution' or yellow intermittent flashing light with or without the word 'Caution' under which control vehicles approaching shall be driven through such controlled area with extra caution. No traffic control signal or device shall be erected or maintained upon any city street designated as forming a part of the route of a primary state highway unless first approved by the director of highways.

"In any traffic control signal directing traffic to alternatingly stop and go, the red 'Stop' signal shall be located at the top of such signal and the green 'Go' signal shall be located below the 'Stop' signal."

The statute gives the right of way to the pedestrian, who is lawfully in the intersection immediately prior to the time the green signal is exhibited, permitting vehicles to proceed; also, where a directional arrow permits vehicles to proceed against a red light. But the statute is silent as to a situation where the pedestrian proceeds across the intersection with the green light, and the automobile proceeds from the opposite direction with the same green light and then turns left. However, when the driver turns left, he is then proceeding against a red light. True, the statute gives him that right. But, obviously, when a driver finds himself in that position, he must, of necessity, yield to the pedestrian who is lawfully within the intersection by virtue of the green light.

In *Gable v. Field, supra,* error was assigned upon the refusal of the trial court to give the following instructions:

" 'If you believe from the evidence that from the safety island or zone across to the opposite curb there was a cross walk marked or unmarked for pedestrians, and that the plaintiff, being in the safety island or zone, and desiring to go across the street to the opposite curb, started in and along such sidewalk, then I charge you that as a matter of law she had the right-of-way and the right to assume that no vehicle would run upon or against her and to proceed accordingly and that she could continue so assuming until she reached the opposite curb.

" 'A pedestrian at an intersection where traffic is controlled by automatic signals has the right to start across the street upon the crosswalk provided for pedestrians, whether the same be marked or unmarked on the street, with the "Go" or green light and to assume that drivers of vehicles will likewise observe the light and obey the law and will yield to them the right of way until they have reached the opposite curb.' "

We said:

"Those instructions are correct under our decisions in *Johnson v. Johnson*, 85 Wash. 18, 147 Pac. 649; *Riddel v. Lyon*, 124 Wash. 146, 213 Pac. 487, 37 A. L. R. 486; *Jurisch v. Puget Transportation Co.*, 144 Wash. 409, 258 Pac. 39; and *Woods v. Greenblatt*, 163 Wash. 433, 1 P. (2d) 880."

We do not wish to be understood as holding that a pedestrian, proceeding with the green light at an intersection where automatic signals are provided, may blithely enter the intersection without due regard for his own safety. But the question of whether or not he exercised such care, is ordinarily one of fact and not of law. The conduct of an ordinarily prudent person under such circumstances must be largely determined by the condition of the traffic at the particular time and place in question, and the rights and duties of both the driver of the automobile and the pedestrian.

Appellants contended in the trial court, and contend here, that respondent was guilty of contributory negligence as a matter of law. We have examined the thirty-seven cases citing the *Silverstein* case, *supra*, and in each one in which the rule of that case was adopted, the minds of reasonable men could not differ upon the proposition that the

plaintiff was guilty of contributory negligence. Furthermore, in each of such cases, the accident occurred at an intersection where there were no automatic signals. Here, the accident might not have happened, if the respondent had looked sooner, or if Hunter had blown his horn, or if he had stopped.

Appellants contend that respondent was guilty of gross negligence in that he did not see Hunter until immediately prior to the accident. However, it must be remembered that respondent was lawfully within the intersection. It was for the jury to determine whether or not he had the right to assume, had he seen Hunter angling towards him, that Hunter would yield to him and permit him to proceed. The minds of reasonable men could differ on this point.

Under the facts in this case, respondent was not guilty of contributory negligence as a matter of law. The question of his conduct, under the circumstances, became a question of fact for the jury to decide, under proper instructions. It will be remembered that this is an appeal from a general order which was granted for a new trial without any reasons being given therefor, thereby making it necessary for us to give full credit to the evidence favorable to respondent and the reasonable inferences to be deduced therefrom.

■ The only matter before us being the review of the general order granting a new trial, any question concerning the giving of instructions by the trial court, to which exceptions were taken, is not properly before us, and we shall neither approve nor disapprove the giving of such instructions.

Without further burdening this opinion, we hold that the trial court was correct in granting a new trial, and that order is affirmed.

MALLERY, C. J., ROBINSON, and JEFFERS, JJ., concur.

BEALS, J. (concurring)—It appears from Rem. Rev. Stat., Vol. 7A, § 6360-98 [P.P.C. § 295-47], quoted in the majority opinion, that the law lacks, what doubtless would have been

included therein had the matter been called to the attention of the legislature, any provision giving some restricted right of way to a pedestrian finding himself in the position of the respondent in the case at bar with regard to a motor vehicle pursuing the course followed by the truck, which collided with the respondent. The second paragraph of the section accords to a motor vehicle the right to enter a traffic-controlled intersection with the green light and then turn to the right or left against the red light and proceed across the lane, where pedestrians may be moving with the green light in their favor. The section carefully preserves to pedestrians, who enter the intersection with the green light, the right to enjoy the right of way until the intersection is crossed, even though the signals turn while the pedestrians are in the intersection; but the statute does not give a pedestrian, who enters the crossing with the green light and proceeds with the green light, any right of way over a motor vehicle which enters the intersection with the same green light and then turns to the right or left.

The section quoted provides that a motor vehicle, entering an intersection with the green light, may turn to the right or left if such a turn be indicated by a directional arrow, but may so turn "only with the exercise of due caution and if the same can be done without interfering with other traffic or endangering pedestrians lawfully within the controlled area."

The first situation referred to implies more danger to pedestrians than the second because the existence of the green arrow serves as some warning to pedestrians that a motor vehicle may make the turn against the red light.

To say that a pedestrian, crossing an intersection with the green light, is warned of a turn in his direction by a motor vehicle, which also enters the intersection with the green light, by observing some hand signal given by the driver, assumes too much as, in a crowded intersection, a quickly given signal, while adequate to warn other motor vehicles, may well not be observed by a pedestrian who, in crossing a crowded intersection, must maintain observation in sev-

eral directions, and whose vision may be obstructed by other cars.

In the case at bar, respondent was facing north on the east side of Division street, intending to proceed north across the intersection. The truck which collided with respondent was proceeding south on Division street, the driver intending to turn east onto B avenue. From the evidence, it appears that respondent had proceeded halfway across B avenue when he was struck, from which it may fairly be deduced that the truck had made a rather quick turn to the driver's left.

Assuming that a pedestrian, occupying the position of respondent, started across the intersection with the green light, while an automobile, which had been proceeding north on Division street, also entered the intersection with the green light, but immediately turned to the east on B avenue, it would seem that the pedestrian might well suffer serious injury from a car which he never saw, although, under the law, the vehicle had the same right to enter the intersection and turn that the pedestrian had to proceed straight across the intersection.

The absence of any statutory right of way in such situations may well remind one of the ancient Scottish definition of the relationship existing between the Scottish Kirk and the state, which was frequently defined as "coordinate jurisdiction with mutual subordination." It was often as difficult to apply that definition to a particular state of facts as it is to determine the respective rights of a pedestrian and a motor vehicle in the situation disclosed by the facts in the case at bar, or in the situation which I have assumed.

In such a case as this, the doctrine of contributory negligence, while properly applied in certain cases, should, in my opinion, be only so applied in such a case as this when it can be said that, under all the facts, the pedestrian was very clearly guilty of *negligence* which contributed to the accident. Regardless of statute, the primary duty rests upon the driver of a turning motor vehicle to so operate his car as to avoid injury to pedestrians lawfully crossing the intersection.

In my opinion, the record in the case at bar discloses a state of facts which does not warrant a judicial holding that respondent was, as a matter of law, guilty of contributory negligence.

MILLARD, J. (dissenting)—An examination of the statement of facts discloses that respondent entered the intersection and proceeded on his way without due regard for his own safety. Respondent testified that there was nothing to prevent him from seeing the truck in sufficient time to avoid the accident. The mere fact that one may have the right of way does not excuse such person from exercising care for his own safety.

Respondent was guilty of contributory negligence as a matter of law, and that contributory negligence was a proximate cause of the accident.

The action should be dismissed.

STEINERT and SIMPSON, JJ., concur with MILLARD, J.

HILL, J. (dissenting)—I agree that the respondent, at the time and place of the accident, was not in the course of his employment within the meaning of the workmen's compensation act.

In this case appellant's driver, going south on Division street, entered the intersection with a green light and made a left turn to go east on B street, as Rem. Rev. Stat., Vol. 7A, § 6360-98 [P.P.C. § 295-47], gives him a right to do; the respondent, a pedestrian, entered the intersection with the same green light, his course being north across B street on the east side of Division street. So much of the majority opinion as purports to give the respondent a right of way under those circumstances is judicial legislation. I personally am disposed to believe that the pedestrian should have the right of way under such circumstances, but this court has no power or authority to give it to him, and it is not given by any statute. *Strom v. Dobrin,* 29 Wn. (2d) 198, 186 P. (2d) 906.

As pointed out by Judge Beals in his concurring opinion, had there been a driver proceeding north on the same side

of the street as the pedestrian in this case, and had that driver made a right turn, the pedestrian might have been injured by a car which he had not had an opportunity to see, although, under Rem. Rev. Stat., Vol. 7A, § 6360-98, they both had the right to enter the intersection with the same green light. It is difficult to conceive of a case wherein the pedestrian would not recover in such a situation, not because the statute has given him a right of way but because no court or jury determining the facts would hold that he was guilty of negligence in not watching to the rear for a car there had been no opportunity for him to see. It is, however, a very cogent argument for the amendment of Rem. Rev. Stat., Vol. 7A, § 6360-98, to give a right of way over all vehicles to the pedestrian proceeding with a green light at a controlled intersection.

If there was any evidence of ordinary care on the respondent's part to take the question of contributory negligence to the jury, we could not, under our repeated holdings, reverse a general order granting a new trial, particularly when one of the instructions was unduly emphasized by being prefaced with the words, "Our Supreme Court has time and time again said. . . ." However, this case clearly falls within that classification wherein we have reversed orders granting new trials and directed dismissal of the actions because, there being no substantial conflict in the evidence, the contributory negligence of the plaintiffs was established as a matter of law.

I have written a dissent instead of joining in that of Judge Millard, which presents my views in the instant case, because more important than the determination of this particular case is the necessity of keeping the record straight on the proposition that the granting of rights of way is a legislative and not a judicial function.